OPINION OF THE COURT
Timothy J. Lawliss, J.
On March 27, 2006, the Clinton County Department of Social Services filed a petition alleging that the respondent mother, Lisa B., abused and neglected two of her children including the child that is the subject of this proceeding. On March 28, 2006, the court issued a number of orders, with the consent of the respondent, including an order that removed the subject child from the respondent’s custody and placed the child with the Clinton County Department of Social Services (which in turn placed the child with certified foster parents). On May 8, 2006, the respondent Lisa B. admitted to certain allegations and consented, pursuant to Family Court Act § 1051 (a), to this court entering an order finding that the subject child is a neglected child as that term is defined in Family Court Act § 1012 and that the respondent mother is responsible for the neglect. On June 7, 2006, the maternal grandfather Helmut B. and his wife, Debra B., applied for an order to intervene pursuant to Family Court Act § 1035 (f). Immediately prior to the commencement of the dispositional hearing, and upon the consent of all appearing parties, the application to intervene was granted. On June 8, 2006, the court conducted a dispositional hearing under Family Court Act article 10, but reserved judgment at the conclusion of the hearing. To date, no final order of disposition has been entered.
The facts of this case are undisputed. The father is not interested in caring for the child. Although not present at the hearing, he informed the caseworker that he was in favor of the maternal grandfather obtaining custody of the subject child. The mother, a chronic alcoholic, does not claim that she is currently fit to properly care for the child. She also is in favor of the subject child living with the maternal grandfather. Thus, extraordinary circumstances exist in that both parents are either unwilling or unable to currently provide adequate care for the subject child. Both parents, the child’s law guardian and the court all agree that the best interest of the child would be served by the child residing with the maternal grandfather. The maternal grandfather is a fit and willing relative who has *237 volunteered to care for and raise the child. At first this may appear to be an easy matter to decide and that the child should now begin residing with her maternal grandfather; however, there is a catch. The maternal grandfather happens to live across the state line in the state of Pennsylvania and this decision is being made in the context of an article 10 proceeding brought by the Clinton County Department of Social Services. Thus, begins our analysis of a series of well-intentioned laws and cases designed to help children, but whose net effect harms children by making it difficult for the court to issue orders which are in the subject child’s best interest.
The Department of Social Services does not dispute that the maternal grandfather is a fit and willing relative; however, it argues that the court may not legally place the child under Family Court Act § 1055 out-of-state with a relative without first complying with the Interstate Compact on the Placement of Children. The Department’s legal unit did not provide the court with any authority to support its position; nevertheless, the Department is correct. Although there is not an uniform opinion across the nation (see, McComb v Wambaugh, 934 F2d 474 [3d Cir 1991]), the Court of Appeals has made it clear in the case of Matter of Shaida W. (85 NY2d 453 [1995]) that New York law prohibits the placement of a child under article 10 with an out-of-state relative without going through the Interstate Compact process.
The Interstate Compact process was designed with the best of intentions. It was intended to facilitate the placement of children with fit and willing relatives out-of-state. It was designed to permit courts to gather information about relatives living outside of the state, so that those relatives would be considered even though they were difficult to investigate by New York State agencies. It appears that the Interstate Compact process was also designed to ensure that state agencies were not simply dumping children out-of-state to remove the children from their caseloads. Both of these goals are indeed noble.
Nevertheless, as a practical matter, the Interstate Compact process is so slow that, in 2003, the Third Department found that it routinely takes in excess of four to six months before information can be received back from the out-of-state agency conducting the investigation (see, Matter of Marcy RR., 2 AD3d 1199 [3d Dept 2003]). The process appears to be getting even slower. Just last month, a press release from the United States House of Representatives Committee on Ways and Means dated *238 May 24, 2006, announcing the approval of a bill entitled “Safe and Timely Interstate Placement of Foster Children Act of 2006,” stated that “[c]urrently, these interstate placements take an average of one year longer than placement within a single State, delaying the safe placement of thousands of children.” In practice, the typical delay is so long that the requirement to use this process often eliminates viable alternatives from the court’s consideration and thus harms the child rather than helps the child.
This obstacle is particularly frustrating in the twenty-first century. Today, so many records are computerized and the local New York State agency through computer searches and telephone interviews can obtain almost as much information about the interested relatives as the out-of-state agencies located where the relatives reside. Also, today our society is increasingly more mobile. The days where it was common for an extended family to all be living in the same geographic region has long disappeared. It is now the norm rather than the exception that some of the relatives of an abused and/or neglected child live outside of the state where the abuse and/or neglect is adjudicated.
The frustration felt by this court is clearly felt by many. The American Bar Association House of Delegates (Aug. 11-13, 2003) adopted a resolution in large part “encouraging state, local and territorial officials to recognize the need for the timely disposition of requests for approval of interstate placements.” “As a result of all the problems associated with the Compact, what should take days or weeks to accomplish often takes months or, at times, over a year while children wait in temporary out-of-home placements for the adults in charge of their futures to fulfill their professional obligations” (Bruce A. Boyer, Chair, Steering Committee on Unmet Legal Needs of Children, report in support of resolution [Aug. 2003]).
In this case, not only can the local agency review the computer records, but the maternal grandfather and his wife traveled to present themselves to this court, voluntarily testified before the court and subjected themselves to cross-examination. All parties had an opportunity to judge the maternal grandfather’s and his wife’s credibility and character in person.
In this case the local Department of Social Services had not yet initiated an Interstate Compact application at the time of the dispositional hearing. Thus, under Matter of Shaida W., placement with the maternal grandfather pursuant to Family *239 Court Act § 1055 is not an option to the court, and will not be an option for many months.
Since Family Court Act § 1055 placement with the child’s grandfather is not an option, the court turns to the question of whether or not it could issue a permanent custody order under article 6 of the Family Court Act to the maternal grandfather. Again, both parents do not object to the maternal grandfather obtaining permanent custody. Although the court believes that a temporary placement is more appropriate at this time than a permanent custody order, a permanent custody order to the maternal grandfather (which is always subject to modification in the future, if circumstances should change) is more desirable for the child than for the child to linger in foster care for many months while the court waits for the Interstate Compact process to be completed.
When considering this option, the court must review the recent Third Department decision in Matter of Felicity II. v Lance RR. (27 AD3d 790 [3d Dept 2006]), which held that the Family Court could not even entertain an article 6 petition filed by a nonparent while an article 10 Family Court order of placement was in existence. The Third Department states that to entertain an article 6 petition for custody by a nonparent while an article 10 order of placement exists, “completely disrupt[s] the parent’s effort to reunite with the child” (at 792). This court notes that in Felicity II., the Department of Social Services, as required by law, had created a service plan with the goal of reuniting the child with a parent.
Perplexingly, the Third Department distinguishes Felicity II. from its earlier decision in Matter of Marcy RR. (2 AD3d 1199 [3d Dept 2003]). In Marcy RR., the Third Department affirmed an article 6 custody order to a nonparent which was issued while an article 10 petition was pending. But in Marcy RR. the article 6 custody order was issued prior to a final order of disposition being issued in the article 10 proceeding. It is difficult for this court to understand why the existence of a final article 10 order of disposition would be dispositive on the question of whether or not Family Court can entertain an article 6 nonparent’s custody petition. Generally, once an article 10 petition is filed, the Department of Social Services’ legal obligation is to immediately start working for the reunification of the child with the parent. Thus, it would appear that the rationale relied upon by the Third Department in Felicity II. should apply with equal strength prior to the issuance of a final order of disposition.
*240 It also is difficult to understand why if a nonparent steps forward to take care of the children a day before the court issues a final article 10 order of disposition, the court not only may, but must consider the suitability of that person before placing the child in foster care. But, if the same person steps forward to seek permanent custody a day after an article 10 order of disposition is entered, the court cannot even entertain the same person’s custody petition. Nevertheless, it appears that in the Third Department the Family Court is compelled to distinguish the two situations.*
Thus, under the existing case law, as strange as it may appear, the Family Court cannot temporarily place the child with her maternal grandfather in Pennsylvania under Family Court Act § 1055 prior to the completion of the Interstate Compact process, but the Family Court may permanently grant custody to the child’s maternal grandfather in Pennsylvania under article 6 prior to the issuance of a final order of disposition under article 10. The court acknowledges that this conclusion *241 also depends upon the court making a finding that the Interstate Compact process does not apply when an out-of-state relative files a straight custody petition for a child within the State of New York. This court could not locate any case in which any party claimed that the Interstate Compact process applies to article 6 custody proceedings. Furthermore, the Third Department in Marcy RR. specifically affirmed an article 6 custody order granting custody to an out-of-state nonparent notwithstanding the lack of the out-of-state relative’s submission to the Interstate Compact process. (See also, Social Services Law § 374-a [1], arts II, III.)
Finally, the court notes that Felicity II. was interpreting statutory law in effect prior to the December 2005 amendments of Family Court Act § 1017. Family Court Act § 1017 (2) (a) (i) now expressly authorizes the court to place the child in the custody of a relative pursuant to article 6 of this act. In the instant case, the Department did, pursuant to court order, conduct a Family Court Act § 1017 investigation and found the maternal grandfather to be a suitable relative. Thus, even if the above analysis is incorrect and the Third Department does not intend to make the distinction between the Family Court’s authority to issue article 6 custody orders prior to a final article 10 dispositional order as compared to after a final article 10 dispositional order is entered, now, with the amendments to Family Court Act § 1017, the Legislature has expressly authorized the issuance of an article 6 custody order to nonparents while an article 10 action is pending. To hold otherwise would directly contradict the express language of Family Court Act § 1017.
Accordingly, the court will issue an article 6 custody order pursuant to Family Court Act § 1017 awarding custody of the subject child to her maternal grandfather, Helmut B. After the issuance of said article 6 order, the court will issue a final order of disposition in the article 10 proceeding.

 Another interesting consequence of Felicity II. is the creation of a class of individuals who have greater protection regarding their custodial rights than in the general population. Generally, any person has the ability to successfully obtain custody of any child if they can prove extraordinary circumstances with respect to the child’s parents and establish that a custody order would serve the best interest of the child. (Matter of Bennett v Jeffreys, 40 NY2d 543 [1976].) Under Felicity II., there is a protected class of individuals for whom this is no longer true. Ironically, the protected class of individuals are those who have been found to have neglected and/or abused their children and had those children placed in foster care under a final order of disposition. Under Felicity II., once a child has been neglected and/or abused and placed in foster care by a final order of disposition, no party can pursue a final order of custody as long as that final order of disposition is in effect and the goal is “return to parent.”
It is also interesting to note that the Court in Felicity II. speaks of a time frame defined as “during the pendency of an order of placement” (at 790). This is problematic given the recent modifications to article 10 and the adoption of article 10-A. Now, when a child is placed with an agency, generally the placement continues indefinitely until the court determines that the placement should be terminated at a permanency hearing. Thus, in cases where reunification with a parent is not a viable option, and the court is looking for the alternative of a permanent placement with a fit and willing relative, how is that to be accomplished? If the court cannot entertain the article 6 petition while the article 10 petition is in existence, is the proponent of the prospective relative to advocate for the termination of the article 10 order so that the relative can then immediately go to the clerk’s office, apply for permanent custody and seek an immediate temporary order? This approach appears to be, at best, awkward.
It is the respectful hope of this court that the Third Department will have the opportunity to revisit issues raised in Felicity II. in the near future.