Matter of D.A. (Y.A.) (2024 NY Slip Op 24225)

[*1]

Matter of D.A. (Y.A.)

2024 NY Slip Op 24225

Decided on July 22, 2024

Family Court, New York County

Pels, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on July 22, 2024
Family Court, New York County

In the Matter of D.A. 
 A Child Under Eighteen Years of Age Alleged to be Neglected by Y.A. (aka V.E.), Respondent.
L.A., Petitioner,
against
Y.A., Respondent.
 

Docket No. NN-XXXXX-23

Yasmin Laskar-Elsayed, Esq.
Family Court Legal Services
Attorney for the Petitioner on the Neglect, Administration for Children's Services
150 William Street
New York, New York 10038
Rachel Patterson, Esq.
Monica Shah, Esq.
Attorneys for the Respondent Mother
Neighborhood Defender Service of Harlem
317 Malcolm X Boulevard
New York, New York 10027
Kenneth Walsh, Esq.
Attorney for the Maternal Grandmother, Petitioner on the V docket
211 E 43rd Street New York, New York 10017
Doneth Gayle, Esq.
Attorney for the Subject Child
Lawyers for Children
110 Lafayette Street
New York, New York 10013

Valerie Pels, J.

This matter raises two recurring legal questions in child protective proceedings about the interaction of Articles Ten and Six of the Family Court Act and the applicability of the Interstate Compact on the Placement of Children ("ICPC") to custody petitions filed by an out-of-state relative, other than a parent, when a child protective proceeding is pending, which should be clearly settled in light of statutory amendments to the Family Court Act and the Court of Appeals decision in Matter of D.L. v S.B., 39 NY3d 81 [2022]. The Administration for Children's Services ("ACS") routinely opposes efforts to place children with relatives out of state pursuant to Article Six without an ICPC, whether during or at the conclusion of a child protective proceeding, relying on outdated authority that is no longer good law. Their position is not only legally untenable but unnecessarily harms children.
D.A. (d.o.b. X/X/23) is the subject child of a neglect petition filed December 21, 2023, under docket number NN-XXXXX-23, wherein it is alleged that his mother, Y.A., failed to provide adequate supervision and guardianship after D.A., at three months old, was diagnosed with failure to thrive, Tylenol toxicity and tested positive for amphetamines. D.A. was removed from his mother's care pursuant to this court's order entered December 21, 2023 and is presently in non-kinship foster care in New York.
On February 16, 2024, the Attorney for the Child ("AFC") filed an order to show cause seeking the release of D.A. to his maternal grandparents, L.A. and J.A., in Indiana. At that time, D.A. had been in the hospital for over two months and was ready for discharge. His maternal grandmother was reported to have been visiting with him in the hospital daily but no other information was available about the grandmother's history or home environment or about other household members in Indiana. ACS, petitioner in the neglect case, opposed the application arguing that an ICPC was required. Interim relief of placement with the maternal grandmother was denied, with the understanding that she would file a petition for custody and that efforts would be made to gather information about her suitability as a resource.
The maternal grandmother filed a petition for custody of D.A. on March 13, 2024. The AFC and respondent mother indicated that they would consent to the immediate entry of a final order of custody of the child to the maternal grandmother, even though the underlying neglect petition has not yet gone to fact-finding. In order to expedite D.A.'s placement with his grandmother, the respondent mother was willing to consent to a final order of supervised visitation, understanding that any future modification of such order would be on notice to ACS [*2]and the AFC and entail consideration of the safety concerns raised in the neglect petition.
Indiana child protective and criminal clearances for the maternal grandmother and all adult household members have been obtained and provided to the court and counsel by the grandmother without resort to an ICPC.[FN1]
A home study was also completed by a social worker retained by the maternal grandmother who traveled to Indiana and made an in-person visit to the home. Based on the information provided to the court, there are no current identified safety concerns that would preclude D.A.'s placement in the care of his maternal grandmother.[FN2]

Nevertheless, ACS objects to the placement of D.A. with the maternal grandmother without an ICPC and is opposed to the court entering a temporary or final order of custody prior to the court's adjudication of the underlying neglect matter. For the reasons discussed herein, the court finds that it has the authority to enter a temporary order of custody during the pendency of the neglect case but that a final order may not be entered until the neglect case is adjudicated. The court further finds that the ICPC does not apply in this circumstance and that the best interests of the child would be served by granting a temporary order of custody to the maternal grandmother at this time.[FN3]

Pursuant to Family Court Act ("FCA") § 1017, whenever a court determines that removal of a child from his or her home is necessary, the court must direct ACS to conduct an investigation to determine whether there is a suitable non-respondent parent or other kinship resource that is available to care for the child.[FN4]
If a suitable non-respondent parent or other [*3]kinship resource is identified through such investigation, the statute not only permits but requires that the court place the child with such resource, reflecting the legislature's preference for placing children with family when a suitable relative is available to care for the child. Specifically, section two of FCA § 1017 provides that if, after conducting certain registry checks, the court determines that the child may appropriately reside with a non-respondent parent or kinship resource, the court "shall, upon receipt of the report of the investigation ordered" pursuant to section one of the statute, determine whether there is a suitable parent or kinship resource available to care for the child and, if so, either grant a temporary order of custody or guardianship to such parent or kinship resource pursuant to Article Six, temporarily release the child to the non-respondent parent, temporarily directly place the child with the identified suitable kinship resource (without a temporary order under Article Six) or, if the resource qualifies as a kinship foster parent, remand the child and direct that the child reside in the home of that resource (FCA § 1017(2)(a) [emphasis added]). Placement in non-kinship care is authorized only if there is no suitable kinship resource identified (FCA § 1017(2)(b)). 
Family Court Act § 1017(2)(a)(i) expressly authorizes a court to grant a temporary order of custody under Article Six of the Family Court Act to a parent or other kinship resource during the pendency of an Article Ten proceeding. Pursuant to FCA § 1017, a final order of custody to such relative may be entered at disposition pursuant to FCA § 1055-b (id.). Nothing in FCA § 1017 limits the court's authority to issue a temporary or final order of custody only to in-state relatives. 
A final order of custody is an authorized disposition in an Article Ten proceeding pursuant to FCA § 1052(a)(vi), where the court finds after a joint disposition and custody hearing held pursuant to FCA § 1055-b and consideration of a number of enumerated factors, that "granting custody or guardianship of the child to such person or persons is in the best interest of the child and that the safety of the child will not be jeopardized if the respondent or respondents under the child protective proceeding are no longer under supervision or receiving services." The language of FCA § 1055-b, somewhat confusingly, provides that whether a fact-finding hearing in the neglect matter has been completed is a factor to be considered in evaluating best interests. However, to the extent that FCA § 1055-b applies to final orders of custody or guardianship entered at the conclusion of the dispositional hearing, the fact-finding would by definition have been completed prior to the entry of the final order of custody.
Reading FCA §§ 1017 and 1055-b together, it would appear that entry of a final order of custody to a relative while a child protective proceeding is pending is not authorized until disposition, unless the Article Ten petition is either withdrawn or dismissed prior to disposition pursuant to FCA § 1051-c. However, it is equally clear that the entry of a temporary order of custody is not only permissible but expressly contemplated by statute, as set forth in FCA § 1017(2)(a)(i).
To the extent that ACS, in its opposition papers, relies on Matter of Tristam K., 25 AD3d 222 [1st Dept 2005] and Matter of Felicity II v Lance RR., 27 AD3d 790 [3d Dept 2006] for the proposition that the court lacks the authority to entertain a custody petition while a child protective proceeding is pending, that reliance is misplaced. Statutory amendments have superceded those decisions, as subsequent decisions have recognized, since those matters were decided (Matter of Gabriel James Mc., 60AD2d 1066 [2d Dept 2009] [effect of 2005 and 2008 amendments to FCA § 1017 was to overrule prior caselaw, including Tristam K., which imbued a parent charged with neglect or abuse with veto power over the placement of a child with the [*4]non-custodial parent or other relative]; Matter of Crystal A., 13 Misc 3d 235 [Clinton Cty 2006] [Lawliss, J.] [observing that the court in Felicity II appears to have been interpreting statutory law in effect prior to the December 2005 amendments to § 1017 of the Family Court Act to expressly permit the court to enter orders of custody while an Article Ten petition is pending]).
FCA § 1017 has been amended eight times between 2004 and today. The effect of those successive amendments has been to strengthen the rights of non-respondent parents, other relatives and non-kinship resources with an existing connection to the family or the child, to seek placement or custody of a child removed, pursuant to Article Ten from a parent or person legally responsible for the child (see Merril Sobie, 2016 Practice Commentary, McKinney Cons Laws of NY, FCA § 1017). Amendments to FCA § 1017 made in 2005 and 2016, and the addition of FCA § 1052(a)(vi) and § 1055-b in 2009 superseded previous caselaw which limited the court's authority to entertain custody petitions during the pendency of a child protective proceeding. In December 2005, the language of subsection 2(a)(i) was changed from "place the child with such relative and conduct such further investigations as the court deems necessary" to "place the child in the custody of such non-respondent parent, other relative or suitable person pursuant to article six of this act and conduct such other and further investigations as the court deems necessary." This change made clear that an Article Six custody order could be made while an Article Ten case was pending, making formal intervention in the Article Ten proceedings pursuant to FCA § 1035, which is limited to a much narrower category of relatives, and is permitted only with the consent or on the default of the respondent, unnecessary.
The 2009 amendment of FCA § 1052, which lists authorized dispositions after a finding of neglect or abuse is entered in an Article Ten proceeding, made explicit with the addition of subsection (a)(vi) that a final order of custody to a parent or relative pursuant to Article Six is an authorized disposition under Article Ten. FCA § 1055-b, added at the same time, authorizes the court to conduct a combined Article Ten dispositional hearing and Article Six custody hearing and to enter a final order of custody after due consideration of certain enumerated factors. FCA § 1055-b addresses the concern raised in Felicity II that the entry of a final order of custody to a relative could disrupt family and agency efforts to work toward reunification, a central priority of the statutory child protective scheme, by requiring the court to weigh these considerations. It explicitly requires due consideration of the permanency goal established for the child and "whether compelling reasons exist for determining that the return home of the child and the adoption of the child are not in the best interest of the child and are, therefore, not appropriate permanency options" prior to the entry of a final order of custody which would end ACS's involvement with the family (FCA § 1055-b(a)(ii)).
A subsequent amendment to subsection (2)(a)(1) of FCA § 1017 effective June 18, 2016 clarified that a temporary order of custody could be entered during the pendency of the case, prior to disposition and that a final order court be entered pursuant to FCA § 1055-b. While the standard for granting a temporary order of custody during the pendency of an Article Ten proceeding, as opposed to a final order, is not set forth in the Family Court Act, the same considerations set forth in FCA § 1055-b would apply. While a parent no longer has veto power, prior to adjudication of the merits of the neglect or abuse allegations, particularly if the proposed resource is in a distant state, the impact on the ability of the parent to visit or plan for reunification would be important factors to consider if the parent were not in support of the plan. Here, however, the parent has unequivocally indicated her support for her mother, the child's maternal grandmother, being awarded not only temporary custody but a final order of custody.
The court finds that the ICPC is not applicable here. In reaching this conclusion, the court notes that the ICPC is clearly not applicable to custody proceedings where there is no pending child protective proceeding (ICPC Regulation 3(3), American Public Human Services Association, ICPC Regulations, https://aphsa.org/AAICPC/AAICPC/ICPC_Regulations.aspx). The First Department has also noted, albeit in dicta, that the ICPC does not apply to a final order of custody made pursuant to Article Six of the Family Court Act after a consolidated custody and dispositional hearing on an Article Ten petition (Matter of Louis N., 98 AD3d 918 [1st Dept 2012]). ACS urges the court not to follow the dicta in Louis N., even though that decision is consistent with subsequent binding authority from the Court of Appeals.
The Court of Appeals in Matter of D.L. v S.B., 39 NY3d 81 [2022], made clear that the ICPC applies only to foster care and adoptive placements, even where a child protective proceeding is ongoing. The Court of Appeals in that case settled what had been a split in authority between the First and Second Departments as to whether the ICPC applies to out-of-state non-custodial parents whose children are in the care of ACS pursuant to a court order in an ongoing child protective proceeding. Largely adopting the reasoning of the First Department in Matter of Emmanuel B., 175 AD3d 49 [1st Dept 2019], and relying on the plain meaning of the statutory language of the ICPC, the Court of Appeals found that the ICPC applied only to foster parents and adoptive resources, and that the ICPC therefore did not apply to non-custodial parents (Matter of D.L. v S.B., 39 NY3d at 91). While this was a landmark decision that substantially affected the rights of non-custodial, non-respondent parents, the implications of the decision are much broader: indeed, while the Court did not expressly make its ruling applicable to other categories of relatives, as has been recognized in the New York Practice Series treatise, "it appears that the court's holding is also applicable to any parent-custodial or non-custodial, respondent or nonrespondentand, more generally, to any non-foster care/adoptive placement out of state. Stated simply, this holding should be applicable to any Family Court Article Six or Article Ten out-of-state custody or guardianship or direct placement issued at any stage of a proceeding" (Gary Solomon & Merril Sobie, New York Family Court Practice § 2.98 [NY Prac Series Jan 2024 update]).
As the Court of Appeals noted in Matter of D.L. v S.B., the ICPC is an agreement among the fifty states, the District of Columbia and the U.S. Virgin Islands which governs the interstate placement of children in foster care or for the purpose of adoption. It is a non-federal statute, codified in New York in Social Services Law § 374-a (Id. at 85). The purpose of the statute is to "promote cooperation among [s]tates in providing each child with the maximum opportunity to be placed in a suitable environment with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care" (Matter of Shaida W., 85 NY2d 453 [1995]). The statute was intended to ensure that the sending state would be able to obtain the most complete information possible to evaluate the safety and suitability of the proposed placement (SSL § 374-a[1][Art I][c]) and to give the receiving state a "full opportunity to ascertain the circumstances of the proposed placement, thereby promoting full compliance with applicable requirements for the protection of the child" (SSL § 374-a[1][Art I][b]).
The ICPC was also designed to prevent states from "dumping" their foster care responsibilities on other jurisdictions (Matter of Shaida W., 85 NY2d at 458). To that end, when a child is placed with a foster care or adoptive resource in another state pursuant to the ICPC, the sending state continues to be financially responsible for the child's care as long as the child remains in foster care (SSL § 374-a[1][Art V][a]). The sending state retains jurisdiction over the [*5]child until the child is "adopted, reaches majority, becomes self-supporting or is discharged with the concurrence of the appropriate authority in the receiving state" (SSL § 374-a[1][Art V][a]).
As set forth in Article III of SSL § 374-a, the ICPC is applicable where a state agency seeks to send a child into a receiving state "for placement in foster care or as a preliminary to adoption" (SSL §§ 374-a[1][Art III][a] & [b]). The statute contemplates the promulgation of regulations (SSL § 374-a[1][Art VII]) and a uniform set of forms and regulations has been promulgated by the Association of Administrators of the Interstate Compact on the Placement of Children (AAIPC), to carry out the terms and provisions of the compact.
ICPC Regulation 3, in direct contravention to the plain language of the statute, makes the ICPC applicable to "[p]lacements with parents and relatives when a parent is not making the placement" (ICPC Regulation 3(2)(a)(3)) and specifically states that "where there is court jurisdiction with an open court case for dependency, abandonment abuse and/or neglect, the case is considered a public court jurisdiction case, which requires compliance with ICPC Article III" (ICPC Regulation 3(2)(b)). However, as the Court of Appeals recognized in Matter of D.L. v S.B., Regulation 3, to the extent that it purports to make the ICPC applicable to placements other than foster care or pre-adoptive placements, cannot be given effect because it is contrary to the express language of the statute (39 NY3d at 89). The Court noted that courts in several other states have reached the same conclusion, citing In re R.S., 470 Md. 404, 412 [2020]; In re Emoni W., 305 Conn. 723, 740-42 [2012]; In re Alexis O., 157 N.H., 781, 787 [2008]; Ark. Dept. of Human Servs., 347 Ark 553, 573 [2002], McComb v Wambaugh, 934 F2d 474, 481-82 [1991].
As noted above, while Matter of D.L. v S.B involved a non-custodial, non-respondent parent seeking custody of their child, placement of a child with a relative pursuant to an order of temporary custody in a separate, parallel Article Six proceeding also does not fall within the purview of the plain language of the ICPC statute. An award of temporary (or final) custody pursuant to Article Six is not a foster care or adoptive placement. It does not implicate foster care funding or require that the resource meet specific foster parent eligibility criteria. This conclusion is supported not only by the statutory construction in Matter of D.L. v S.B., but by the manner in which the Court of Appeals distinguished its prior decision in Shaida W., 85 NY2d 453, supra. The Court in Shaida W. found that the ICPC applied to the placement of children with a grandparent out of state where the grandparent was certified as a kinship foster parent and receiving foster care funding. Significantly, the Court distinguished Shaida W., not on the ground that the resource was not a parent, but that the placement was a foster care placement (Matter of D.L. v S.B., 39 NY3d at 88).
Matter of Tsapora Z. (Tina Z.), 195 AD2d 348 [1st Dept 1993], cited by ACS, is distinguishable inasmuch as the decision indicates that the aunt in that case was seeking a "kinship foster care placement," although this court does also recognize that the facts as recited reflect that the relative in that case had filed a petition for custody and the distinction between a foster care placement and custody pursuant to Article Six of the Family Court Act is not clearly delineated in the decision. Insofar as the decision may be read to apply the ICPC to Article Six custody, it is, in this court's view, no longer good law after Matter of D.L. v S.B.
Further, the statute expressly provides that the compact does not apply to "[t]he sending or bringing of a child into the receiving state by his parent, step-parent, grandparent, adult brother or sister, adult uncle or aunt, or his guardian and leaving the child with any such relative or non-agency guardian in the receiving state" (SSL § 374-a[1][Art VIII][a]). The Court of Appeals in Matter of Shaida W., 55 NY2d at 460, held that this exception does not apply where [*6]the child is in the legal custody of a child protective agency at the time of the move since, in such a case, the child is "sent," not by the relative in question but by the child protective agency that has custody of the child at that point. This holding was reaffirmed in the Court of Appeals' recent decision in Matter of D.L. v S.B., 39 NY3d at 88.
Significantly, the subject children in Shaida W. were already in the care of a grandmother who had been certified as a kinship foster parent in New York when the children and grandmother moved to California with ACS's consent, presumably pursuant to an approved ICPC, though the Court of Appeals decision does not spell this out. The children's mother subsequently also moved to California and the issue in that case was whether the court in New York should extend the placement of the children or, essentially, shift the financial and supervisory responsibility for the family to California, where the family had then been residing for over two years. The court determined that, pursuant to the ICPC, New York retained that responsibility and could be relieved of its responsibility only with the concurrence of the receiving state, California (Shaida W., 85 NY2d at 460-61). At no time did the grandmother in Shaida W. seek custody of the children pursuant to Family Court Act Article Six. However, where the relative has been or is awarded custody (temporary or final) and is the legal custodian prior to "sending" the child out of state, the exception would apply.
Indeed ICPC Regulation 3(3)(c) specifically provides that, "[p]ursuant to Article VIII (a), this Compact does not apply to the sending or bringing of a child into a receiving state by the child's parent, stepparent, grandparent, adult brother or sister, adult uncle or aunt, or the child's non-agency guardian and leaving the child with any such parent, relative or non-agency guardian in the receiving state, provided that such person who brings, sends, or causes a child to be sent or brought to a receiving state is a person whose full legal right to plan for the child: (1) has been established by law at a time prior to initiation of the placement arrangement, and (2) has not been voluntarily terminated, or diminished or severed by the action or order of any court." Clearly, this would apply where an out-of-state parent or relative already had custody prior to the commencement of the child protective proceeding. However, nothing in the statute or regulation limits this exception to circumstances in which the court enters an order of custody before the child protective proceedings commence. A temporary order of custody to the maternal grandmother would bring her within the purview of the exception, giving her the authority to "send" the child to Indiana without resort to the ICPC. Thus, this exception provides a second, independent basis for holding that the ICPC does not apply.
To this court's knowledge, the only published decision since Matter of D.L. v S.B. to address the applicability of the ICPC to relatives other than parents is Matter of Peggy RR. v Jenell RR., 80 Misc 3d 714 [Saratoga Cty 2023] [Harnett, J.]. In that case, the court found that the ICPC did not apply to a custody petition filed by a maternal grandmother, relying on the aforementioned exception under Article VIII that applies to parents and other enumerated close relatives. The court noted that the child in that case was never placed in foster care in the first instance and that the child protective agency was therefore never the legal custodian. The court sought to distinguish Dawn N. v Schenectady County Dept of Social Services, 152 AD3d 135 [3d Dept 2017], wherein the Third Department held that the lower court erred in granting custody pursuant to Article Six of the Family Court Act of a child in non-kinship foster care to an out-of-state grandmother after an ICPC had been conducted and the receiving state, after conducting an investigation, had deemed the grandmother an unsuitable resource and denied the ICPC. While this court understands the trial court's reluctance to contravene appellate authority from the [*7]court's own department which has not been explicitly overruled by the Court of Appeals, in this court's view, to the extent that Dawn N. remains good law after Matter of D.L. v S.B., it should be limited to its facts: that is, to a situation where the sending agency invoked the ICPC where it was not mandatory and, having done so, was arguably bound by the determination made by the receiving state.
In finding that the Court of Appeals' reasoning as it relates to the statutory construction of SSL § 374-a in Matter of D.L. v S.B. applies to relatives other than parents who seek custody pursuant to Article Six while an Article Ten case is pending, the court acknowledges that there are constitutional and public policy considerations that make the application of the ICPC to placements with a parent particularly inappropriate that would not apply to other relatives, or would be less compelling as applied to a non-parent. A parent's right to the care, custody and control of their children has long been recognized as a fundamental constitutional liberty interest (see e.g., Meyer v Nebraska, 262 US 390 [1923]; Pierce v Soc'y of Sisters, 268 US 510 [1925]; Prince v Massachusetts, 321 US 158 [1944]; Stanley v Illinois, 405 US 645 [1972]; Santosky v Kramer, 455 US 745 [1982]). The New York Court of Appeals likewise has recognized the Legislature's policy "to structure New York's foster care scheme around the rights of parents 'to the care and custody of a child, superior to that of others, unless the parent has abandoned that right or is proven unfit'" (Matter of D.L. v S.B, 39 NY3d at 89, quoting Matter of Michael B., 80 NY2d 299, 308-09 [1992]). The Family Court Act provides that, prior to fact-finding in a child protective proceeding, a child may be removed from the care of a parent only upon a showing of imminent risk and a parent in a child protective proceeding, whether a respondent or a non-respondent, has a statutory right to a hearing within three days to seek the return of a child (FCA §§ 1027 & 1028). The First Department in Matter of Emmanuel B., considered these factors, in addition to the plain language of the statute, in concluding that the ICPC did not apply to non-custodial parents (175 AD3d at 59-60). The Court of Appeals in Matter of D.L. v S.B. did not rely on any constitutional considerations in arriving at its conclusion. Indeed, it did not even mention them. Rather, it concluded that the statute, as written, was in harmony with New York public policy, which is consistent with those fundamental constitutional principles (D.L. v S.B., 39 NY3d at 88-89).
While certainly taking a back-seat to the primary parental relationship, a liberty interest in extended family relationships has also been recognized (see e.g., Moore v City of East Cleveland, 431 US 494 [1977] [city ordinance excluding one child from family composition because he was a cousin rather than a brother was unconstitutional]; Rivera v Marcus, 696 F2d 1016 [2d Cir 1982] [half-sibling kinship foster parent had a liberty interest in the kinship relationship which entitled her to certain procedural safeguards prior to termination of foster care agreement]; A.C. v Mattingly, 2007 WL 894268 [SDNY 2007] [subject child removed from kinship foster parents had liberty interest in placement with kinship foster family unit]). New York's statutory child protective scheme prioritizes placement of children with family members when removal from a parent or other person legally responsible is necessary (see FCA §§ 1017 & 1035). Indeed, adherence to ICPC Regulation 3 effectively undermines the purpose of FCA § 1017, which is to facilitate the identification of suitable family placement resources, whether in-state or out-of-state, and to ensure children's placement with family on an expedited basis pending adjudication of the neglect case where a suitable family resource exists.
Even in the absence of constitutional, statutory and policy imperatives favoring placement of children with kinship resources, the plain language of the ICPC statute supersedes [*8]any regulation that purports to expand the reach of the ICPC beyond those categories specified in the enabling legislation. The Court of Appeals' reasoning that Regulation 3 is unenforceable insofar as it is contrary to the plain language of the statute, as set forth in Matter of D.L. v S.B, applies with equal force to parents and non-parent relatives who fall outside the statutory categories covered by the ICPC.
One of ACS' primary practical concerns in taking such placements outside the purview of the ICPC is the challenge that this then creates for ACS to supervise and monitor the well-being of the child during the pendency of the Article Ten proceeding. Indeed, the ICPC provides the only means by which the receiving state may be compelled to monitor the home of an out-of-state relative with whom a child is placed while the Article Ten case remains pending. However, this same argument was made in relation to children released to their parents and rejected by the Court in Matter of D.L. v S.B. (39 NY3d at 90-91). The Court observed that the Family Court Act contains other effective means to ensure the safety of a child before awarding custody to an out-of-state parent, including but not limited to holding hearings, requesting courtesy investigations and reports, and entering temporary orders of custody and requiring the temporary custodian to make the child available for visits with social service officials (39 NY3d at 90-91). All of these safeguards are also available where the proposed temporary custodian is a non-parent. Indeed, FCA § 1017(3) specifically requires that any parent or family resource to whom the child is released or with whom the child is directly placed must submit to the jurisdiction of the court prior to a child's placement with that resource and the court may direct that the resource comply with certain conditions, including but not limited to, producing the child for court-ordered visitation with the respondent or siblings and appointments with and visits by the child protective agency, the AFC, as well as service providers for the child.
In practice, the ICPC has served children poorly. To the extent that ICPC Regulation 7 sets forth timelines for completion of the receiving state's assessment of an out-of-state resource in certain categories of cases where an expedited ICPC may be requested, those timelines are most often honored in the breach. Ministerial errors in the required paperwork and bureaucratic loopholes often contribute to delays in approval of otherwise suitable ICPC placements. As a result, ICPC approvals typically take many months and often in excess of a year to obtain, during which time children must be placed in non-kinship care if there is no in-state family resource.
Moreover, when the ICPC is invoked, the receiving state's decision whether to approve the ICPC is dispositive and the sending state may not place a child with a resource where the ICPC has not been approved by the receiving state (SSL § 374-a[Art III][d]). This is true even if the reason for the denial is not safety-related or the child protective agency and/or the court in the sending state disagree with the receiving state's determination. Furthermore, the receiving state may demand the return of the child to the sending state, even after approval of the ICPC, and the sending state must take the child back, even if the sending agency or the court presiding over the case disagrees with the reasons given for the return (ICPC Regulations 2(10) & 7(12)).
For more than twenty years, courts and legal scholars have been raising concerns about the deleterious effect of the ICPC on children; even the United States Congress has been aware of its shortcomings (Matter of Marcy RR., 2 AD3d 1199 [3d Dept 2003] [noting that the ICPC process at that time took approximately four to six months]; Matter of Crystal A., 13 Misc 3d 235 [Sup Ct, Clinton Cty 2006] [citing a press release from the United States House of Representatives Committee on Ways and Means dated May 24, 2006 which noted that interstate [*9]placements took an average of one year longer than intrastate placements delaying the safe placement of thousands of children]; Vivek S. Sankran,, Out of State and Out of Luck: The Treatment of Non-Custodial Parents Under the Interstate Compact on the Placement of Children, 25 Yale L & Pol'y Rev 63 [2006] [raising constitutional concerns about the application of the ICPC and noting (in fn. 53) that numerous judicial and legal associations including the National Council of Juvenile and Family Court Judges, the American Academy of Adoption Attorneys, and the American Bar Association's Steering Committee on the Unmet Legal Needs of Children, had passed resolutions recognizing the need to address long delays in ICPC approvals]). While the concern that the ICPC was an impediment to children's swift and safe release to a non-respondent parent after removal from the other parent's care was understandably the highest priority for advocates prior to the Court of Appeals decision in Matter of D.L. v S.B., unnecessary barriers to the prompt placement of children with other caring relatives when there is not a suitable parent available to care for the child continue to inure to the detriment of children.
It is well documented in social science literature that trauma associated with changes in placement puts children at risk for negative outcomes including aggression, delinquency and depression, and that multiple placements are associated with delayed permanency, academic problems, and difficulties in forming meaningful attachments (see e.g., Casey Family Programs, Strong Families Issue Brief: What Impacts Placement Stability?, May 12, 2023, available at https://www.casey.org/media/23.07-QFF-SF-Placement-Stability-Impacts.pdf][last accessed Nov. 21, 2023). While kinship placement by no means guarantees stability, children who are initially placed with relatives are more likely to enjoy placement stability than children who are placed in non-kinship care or group settings (Id. at 3).
In short, an overly broad reading of the ICPC risks depriving children of the opportunity to be placed with a suitable relative out-of-state. Under the best of circumstances, it may unnecessarily and substantially delay such placement. As a result, it exposes children to unnecessary harm by requiring multiple placements, without serving the purpose of the statute: i.e., to ensure that out-of-state resources are properly vetted before children are placed with them and to ensure that the receiving state is not saddled with financial responsibility for a child from another state.
Where, as here, the resource will not be receiving foster care funds and will not be under the supervision of the local social services agency (except to the extent that the receiving state consents to undertake such as a courtesy), the financial burden on the receiving state is no different from a non-ICPC placement with an out-of-state relative made in a custody proceeding where there is no child protective agency involved. Further, while the ICPC provides a formal mechanism through which a sending agency or court can obtain information about the suitability of a resource, in our digital age, that information typically can be, and in this case has been, obtained through other means. In short, an ICPC is not only unnecessary in this case to serve the purposes of the statute but is not required under the plain language of the statute and the recent Court of Appeals decision in Matter of D.L. v S.B.[FN5]

Here, the court has sufficient information to determine the suitability of the maternal grandmother as a resource for the subject child. Having determined that removal of the child from his only identified parent was necessary, and that that parent supports the child's immediate placement with her own mother, the court finds that it would be in the best interest of the child to be placed with the maternal grandmother during the pendency of the child protective proceeding. In making this determination, the court has considered not only the information provided about the resource and the mother's stated wishes, but the AFC's strong support of the grandmother as a resource for the child.
Based on the foregoing, on consent of the respondent mother and the AFC and over the objection of ACS, the maternal grandmother is granted temporary custody of the subject child under docket V-01972-24, on condition that she submit to the jurisdiction of the court. The maternal grandmother shall make the child available for court-ordered visitation and, to the extent that ACS seeks to monitor the well-being of the child virtually or in-person in Indiana, shall cooperate with such monitoring, including by local Indiana child protective authorities if they consent to assist with monitoring as a courtesy. The maternal grandmother shall make the child available to the AFC virtually or in-person in Indiana. In addition, the maternal grandmother shall produce the child in New York when and if ordered to do so by the court and shall comply with any other conditions set by the court. Insofar as the court, at this time is issuing a temporary and not a final order of custody, the underlying neglect matter may proceed. In the event of a finding, the court can determine at a combined disposition and custody hearing whether a final order of custody to the maternal grandmother, which would end ACS's involvement with the family, is appropriate and consistent with the best interest of the child.
This constitutes the decision and order of the court.
Dated: July 22, 2024
New York, NY
VALERIE PELS, FCJ

Footnotes

Footnote 1:The maternal grandmother and adult household members requested their own records from the relevant authorities and provided the records to the court. ACS did submit a proposed order to commence an ICPC on February 7, 2024. The court did not sign that proposed order because the court was concerned that, if the court granted a temporary or final order of custody prior to approval of the ICPC, this alone could trigger the denial of the ICPC and a demand by Indiana that the child be returned to New York or make the family ineligible for an expedited Regulation 7 ICPC (SSL § 374-a[art III][d],; ICPC Regulation 2(10)(a); ICPC Regulation 7(4)).

Footnote 2:The social worker, who visited the home and interviewed the grandmother determined that the home was suitable for the subject child. No one in the household has any criminal history. While there is one indicated report from over 21 years ago, the court does not find that the report raises any current safety concerns. The report involved the respondent mother, then a child, being left with a regular babysitter who called in a report after another family member left the child in her care but did not pay her for her services. No further action was taken by Indiana child protective services.

Footnote 3:The temporary order of custody was entered on July 1, 2024 and this decision and order amplifies the court's reasoning.

Footnote 4:FCA § 1017 also requires the investigation of certain resources that may have a significant connection to the child even though not related by blood or marriage and placements with such fictive kin also are given priority over other non-kinship resources not previously known to the child. While the resource in this case is a grandparent, the court uses the term "kinship resource" to include both relatives and fictive kin.

Footnote 5:While Article Six custody determinations are outside the purview of the ICPC, there remains an urgent need to address the chronic delays engendered by the ICPC. Not all suitable and willing family members have the financial means to care for their relative without foster care funding, leaving them no alternative but to go the route of an ICPC. For others, doing so without the financial support to which they would otherwise be entitled may pose a substantial hardship, especially if they become permanent or long-term caregivers.